**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MICHAEL BISHOP

     Plaintiff

   v.

CORNELL UNIVERSITY AND RACHEL FOSTER,

     Defendants

---

### COMPLAINT

The plaintiff, Michael Bishop ("Bishop"), by and through undersigned counsel, brings claims against the defendant, Cornell University, ("Cornell") for engaging in unlawful employment practices prohibited by Title VI and VII of the Civil Rights Act of 1964; violations of the New York State Human Rights Law, N.Y. Exec. L. § 296 et seq., ("NYSHRL"), and promissory estoppel. Plaintiff by and through undersigned counsel, brings claims against the defendant Rachel Foster, ("Foster"), for tortious interference with an advantageous business relationship, tortious interference with a contractual right, discriminatory harassment in violation of NYSHRL, N.Y. Exec. L. § 296, and intentional infliction of emotional distress and in support of those claims, states as follows:

### PARTIES

1. Plaintiff MICHAEL BISHOP is a doctoral graduate student at Cornell University in the discipline of development sociology. He is also a former employee of Cornell University's administration whose wrongful termination and the circumstances surrounding it are the subject matter of this complaint.

2.    Defendant Cornell University is an Ivy League university located in Ithaca, New York, which maintains an active presence in the County, City and State of New York and which, according to its own Division of Financial Services, receives appropriations from both the federal government and New York State.

3.    Defendant Rachel Foster is an alumna of Cornell University and sits on the Alumni Advisory Council of the Einhorn Center for Community Engagement. Defendant Foster, upon information and belief, is a resident of Kings County and her current address is located at 96 Pierrepont Street, Brooklyn, NY, 11201.

## JURISDICTION AND VENUE

4.    This Court's jurisdiction over the subject matter of this action is invoked pursuant to 42 U.S.C.§ 2000e-5(f)(3) and 28 U.S.C. §§ 1331, 1343, and 1367.

5.    This Court has supplemental jurisdiction over Claimant's claims under the NYSHRL and the NYCHRL pursuant to 28 U.S.C.§ 1367.

6.    Venue is proper under 28 U.S.C.§ 1391(b) because Defendant Rachel Foster's current address is located in the Eastern District of New York and all defendants are residents of the State of New York.

7.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 13, 2023, alleging discrimination and retaliation.

8.    The EEOC issued a Notice of Right to Sue on January 2, 2025. See "**Exhibit A**".

9.    By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"); (b) receiving a Notice of Right to Sue from the EEOC on January 2, 2025; (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation

Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action.

## FACTS COMMON TO ALL CLAIMS

### Background and Summary

10. On September 14, 2015, Judith Appleton, then Vice Provost of Cornell, sent Plaintiff a letter by which Cornell offered him a position of employment to become effective December 1, 2015.

11. Plaintiff's initial job title was "Director of Leadership for the Greater Good." The offer included a starting salary of $102,000.00 and a stipend in the amount of $12,000 to cover the cost of Plaintiff's relocation from California to New York. He moved his family from California under the contractual agreement that he would receive ten years of funding for his position.

12. Plaintiff accepted the employment offer and signed the offer letter on September 15, 2015.

13. By all accounts, Plaintiff was a model employee during his entire tenure; was well-regarded by Cornell and in good standing as both an administration employee and Ph. D. candidate.

14. That all changed when after, Rachel Foster, a voluntary member of the alumni advisory council of Cornell's Einhorn Center, complained about Plaintiff's private social media posts through which Plaintiff advocated for the human rights of Palestinian individuals he associated with and the Palestinian people generally, and called for a ceasefire of the war in Gaza.

15. Ms. Foster actively campaigned for Plaintiff's termination solely based on her objections to Plaintiff's expression of his free speech.

16. As Plaintiff served in a leadership role with the Einhorn Center, he met with Rachel Foster, and all other members of its alumni advisory council, in a 1:1 capacity for thirty (30) minutes on or about December 6, 2023.

17. On or about January 5, 2024, Plaintiff's direct supervisor, Basil Safi, informed Plaintiff that an alumna, whom Plaintiff would later learn was Rachel Foster, had visited Plaintiff's Facebook page, disliked his public posts and had contacted the Einhorn Collaborative, openly questioning "how it was possible that Plaintiff was employed by the university".

18. On or about January 6, 2024, Plaintiff posted the first of two "friends only" Facebook posts stating that a Cornell alumnus, whom Plaintiff did not name, was openly seeking the termination of his employment with Cornell.

19. On or about January 12, 2024, Safi informed Plaintiff that one of his "Facebook Friends" had shared one of the private posts with the same Cornell alumna Safi had informed Plaintiff had visited his Facebook page and was pressuring Cornell to fire him.

20. By that date, Safi had identified Rachel Foster as that Cornell alumna.

21. On or about January 15, 2024, Rachel Foster shared an email ("January 15th Email") with Plaintiff, which she intentionally sent to him but later apparently falsely claimed to have sent in error (since Plaintiff was not a part of the pre-existing email thread and for which Ms. Foster had to specifically add his email address into the email chain), which openly acknowledged her campaign to have him fired, seemingly as a means to torment Plaintiff psychologically.

22. On or about January 22, 2024, Plaintiff made the second of two "friends only" Facebook posts in which he named, for the first and only time, Rachel Foster as the Cornell alumna who had mounted the campaign against him.

23. On or about January 28, 2024, Cornell issued Plaintiff a letter of suspension ("January 28th Suspension Letter") by which Cornell informed him that it had launched an investigation into his social media activities which remained pending.

24. The following day, Plaintiff attended a Zoom meeting he had requested with Shan Varna, the head of Cornell's human resources department, and Safi. During the meeting, Plaintiff

specifically complained that, despite the fact that his friends-only social media posts were protected   by Cornell's social media policy amongst others, no one in Cornell's administration had come to his defense or had offered any public show of support.

25. On February 8, 2024, Safi and Varna held a Zoom meeting with Plaintiff during which they informed Plaintiff that Cornell had terminated his employment.

26. Safi followed that meeting with the February 8th Termination Letter on the same day.

27.  Since that time, Plaintiff has challenged Cornell's decision to terminate his employment through its grievance protocol, which he initiated by submitting a formal grievance letter on or about February 21, 2024.

28. As part of such protocol, Plaintiff attended a grievance hearing on May 9, 2024, which culminated in a subsequent decision letter on May 16, 2024.

29. That decision letter came from Katherine A. McComas, Cornell's Vice Provost for Engagement and Land-Grant Affairs, and informed Plaintiff that his grievance had been denied, despite the fact that, at all relevant times, Cornell's codes of conduct, academic freedom policy and social media policy guaranteed Plaintiff's right to exercise free speech in the manner that he did.

30. At the time of this wrongful termination, Plaintiff was merely eleven (11) months from graduating with a Ph. D. from Cornell's doctoral program.

31.  On or about February 12, 2024 – four (4) days after Cornell's termination of his employment, Plaintiff's graduate adviser and another graduate school representative,  informed Plaintiff that the only way for him to continue his Ph. D. program at Cornell was by taking a leave of absence in the fall of 2024. In so doing, those Cornell representatives strongly indicated that not only has Plaintiff's employment with Cornell been terminated, but also that such termination had jeopardized his doctoral candidacy.

32. Cornell's final determination to terminate Plaintiff's employment is arbitrary and lacks any rational basis given the circumstances of this matter, particularly the fact that, at the center of Cornell's basis for the termination, is punishment of Plaintiff for his expression of a political view with which Rachel Foster disagreed.

33. Cornell's unequivocal support for Rachel Foster in her successful campaign to force Cornell to terminate Plaintiff's employment for his expression of free speech and the termination itself directly contradict Cornell's Employee Discipline Policy 6.11.3, University Policy 4.16 and its social media policy.

Employee Discipline Policy 6.11.3

34. In the February 8th Termination Letter, on behalf of Cornell, Basil Safi cited a portion of Employee Discipline Policy 6.11.3, specifically, the portion that reads:

35. "Serious misconduct may also arise as a result of personal behavior by a staff member that has specific job-related or institutional consequences. The connection between such personal behavior and the staff member's employment will be assessed on a case-by-case basis by appropriate leadership. To that end, the university reserves the right to take appropriate disciplinary action, up to and including termination, if an employee engages in out-of-work or off-premises conduct that is sufficiently egregious and/or sufficiently detrimental to the best interests of the university."

36. Accordingly, the crux of this provision, and therefore Cornell's justification for its termination of Plaintiff's employment, is the phrase "conduct that is sufficiently egregious and/or sufficiently detrimental to the best interests of the university."

37. Because Cornell has cited this provision as its basis for terminating Plaintiff's employment, it necessarily must have found that Plaintiff's conduct, as determined solely by Cornell's review of his Facebook posts, was so egregious that it could be rationally viewed as "detrimental to the best interests of the university."

38. Safi states as much in the February 8, 2024 Termination Letter where he informs Plaintiff that "[Cornell has] concluded that your personal behavior as it relates to disparaging a member of our advisory board and Cornell alumna by name on social media is sufficiently detrimental to the best interests of the Einhorn Center and Cornell University such that it constitutes serious misconduct under Policy 6.11.3 and warrants immediate dismissal." The reference to a Cornell alumna is indisputably a reference to Rachel Foster.

39. Yet, Cornell's conclusion in this regard is arbitrary, capricious and without any rational basis, as there was no disparagement of Rachel Foster. The social media posts at issue consist of Plaintiff merely asking his Facebook friends not to forward any of his posts to Ms. Foster, as she was in relentless pursuit of Plaintiff's termination based upon Plaintiff's protected speech opposing the war in Gaza.

40. Additionally, Plaintiff complained of Ms. Foster's harassment in the January 15th Email in which Ms. Foster makes her goal of convincing Cornell to fire Plaintiff abundantly clear. Plaintiff made this report to Basil Safi but, apparently, Cornell failed to conduct any investigation thereof or take any remedial or corrective action.

41. Cornell's failure to investigate Plaintiff's claim of harassment, as evidenced by the January 15th Email, is indicative of that, by its termination of Plaintiff's employment, Cornell was not disciplining Plaintiff for "serious misconduct" under Employee Discipline Policy 6.11.3 but, rather, was punishing Plaintiff for holding and expressing political views whose content Cornell had deemed unacceptable for Plaintiff to hold and express. In other words, Cornell's citation of that policy as the basis for the termination was merely a pretext for its punishment of Plaintiff's political speech and its favoring of Ms. Foster's political views. Thus, Cornell's determination to end Plaintiff's employment is actionable in several ways.

42. As a pretext, this determination is not only arbitrary and capricious but is also not supported by any evidence, as the social media posts at issue cannot reasonably be deemed evidence of "serious misconduct."

43. Additionally, Cornell failed to follow its own stated protocols in effectuating Plaintiff's employment termination because, contrary to Employee Discipline Policy 6.11.3, Safi did not outline steps to correct what he was alleging to be serious misconduct by Plaintiff.

44. Safi also failed to give Plaintiff the details of why he was suspended on January 28, 2024, also in contravention of Employee Discipline Policy 6.11.3.

45. Moreover, further conflicting with Employee Discipline Policy 6.11.3 was Cornell's failure to give appropriate progressive discipline, opting instead to go immediately to a suspension without prior warning and then to termination.

46. Cornell also failed to provide Plaintiff with a clear understanding of how his performance was allegedly not meeting expectations. That failure contradicts yet another protocol Cornell had established within Employee Discipline Policy 6.11.3.

47.   Finally, in further contravention of Employee Discipline Policy 6.11.3, Cornell failed to offer Plaintiff a set time to discuss the suspension, instead placing the onus to do so on Plaintiff.

<u>Policy 4.16</u>

48. In direct contravention of Cornell's Policy 4.16, Cornell based Plaintiff's discipline (both suspension and termination) on his personal use of social media whereas the policy unequivocally states that "Cornell does not seek to limit personal use of social media by faculty, staff or students."

49. Cornell also failed to allow Plaintiff to correct the false information Rachel Foster was disseminating about him and his social media posts, contradicting the protocol required by Policy 4.16.

50. Additionally, Cornell failed to take action concerning the documented online harassment Plaintiff was suffering at the hands of Ms. Foster, offering Plaintiff no assistance - in contravention of Policy 4.16.

Policy 4.23

51. Cornell's Policy 4.23 states, in part, that "Infringement upon the rights of others to speak and to be heard, or interference with the peaceful and lawful use and enjoyment of university premises, facilities, and programs, is never acceptable" and that "Expressive activity that unreasonably interferes with another's quiet enjoyment of their living space is not permitted."

52. Despite these clear mandates, and Plaintiff's complaint concerning Rachel Foster's harassment of him, Cornell enabled, empowered, condoned and endorsed Ms. Foster's campaign to silence Plaintiff in order to prevent him from being heard concerning the Palestinian people who were victims of the war in Gaza.

53. Not only did Cornell fail to refer Ms. Foster to any office that could investigate and adjudicate Plaintiff's harassment complaint - it actually rewarded such harassment by ceding to Ms. Foster's demand to have Plaintiff fired.

Policy 4.24

54. Cornell's Policy 4.24 prohibits the public disclosure of personal information whose disclosure was not authorized by the subject of such personal information.

55. This policy is essentially a prohibition against doxing.

56. Yet, despite its adoption by Cornell, the university failed to protect Plaintiff by adhering to this policy.

57. Instead, Cornell not only allowed Ms. Foster's doxing of Plaintiff's personal information to occur unfettered, but it also sanctioned her behavior by taking the baton of harassment against

Plaintiff Ms. Foster had passed to its administration and exacerbating the damage she had done by suspending Plaintiff and subsequently terminating his employment.

Cornell's Core Values

58. Finally, Cornell's actions in enabling Ms. Foster's harassment, failing to investigate Plaintiff's complaint against said harassment, immediately suspending Plaintiff's employment and ultimately terminating him based on an irrational, arbitrary and capricious justification that lacked substantial evidence, Cornell violated its own core values, adopted in 2019, which state: "We are a community whose very purpose is the pursuit of knowledge. We value free and open inquiry and expression – tenets that underlie academic freedom – even of ideas some may consider wrong or offensive. Inherent in this commitment is the corollary freedom to engage in reasoned opposition to messages to which one objects."

59. Clearly, however one views Plaintiff's social media posts, as the free and open expression of his own ideas, or as reasoned opposition to the dominant messaging around the war in Gaza, the aforementioned factual allegations establish that Cornell failed to uphold its own core values by denying Plaintiff his freedom to freely express his ideas and to engage in reasoned opposition to messages he has found objectionable.

60. In short, under these circumstances, it was arbitrary and capricious for Cornell to terminate Plaintiff's employment on the basis of his innocuous social media posts, with any substantial evidence of "serious misconduct" and then to deny his grievance in the same manner. As such, it was, unequivocally, a wrongful termination.

61. Accordingly, Defendant Cornell's decision to terminate Plaintiff's employment lacks a rational basis in fact and in law and should be vacated.

62. Plaintiff was an exemplary employee and model student who was just recently nominated by the graduate school to be a PhD Degree Marshal and Banner Bearer in the May 2025 commencement ceremony.

63. The facts presented here support Plaintiff's claim that he was fired due to discrimination for his association with Palestinian and Muslim individuals, Indigenous anti-colonial activists, as well as his anti-war political opinion.

64. His support for these persons and communities was reflected in dozens of social media posts where he advocated for Indigenous rights and Palestinian human rights. Mr. Bishop's friendships with Palestinian and Muslim individuals, along with his long-standing advocacy for Indigenous causes, were well known to his supervisor, Safi.

65. Mr. Bishop's activism in support of Palestinian human rights and land dispossession issues related to Indigenous peoples was integral to his local activism and graduate research. His creation of the Sga:t ędwatahí:ne Fellows Program at the Einhorn Center and his involvement in dialogue surrounding the rights of Indigenous communities further illustrate his commitment to these causes.

66. No prior application for the relief requested herein has been made.

67. An Article 78 Petition was filed on separate causes of action against Cornell University in Tompkins County Supreme Court on June 6, 2024 (Index No: EF2024-0409).  The following additional causes of action were alleged: violation of the Fourteenth Amendment of the US Constitution; violation of First Amendment; and an additional cause of action for a declaration. The Article 78 Petition was dismissed by the Court on October 15, 2024. The remaining causes of action were dismissed on January 30, 2025.

**Count I: Discrimination on the Basis of Ethnicity, Religion, and Association Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d et Seq.**

68. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

69. Defendant Cornell University receives federal financial assistance.

70. Defendant terminated Plaintiff's employment on or about February 8, 2024.

71. The termination occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's association with a protected class.

72. Plaintiff's advocacy for Palestinians, Muslims, and indigenous rights constitutes an association with individuals of a protected class based on race, religion, and/or national origin.

73. Defendant terminated Plaintiff's employment because of his association with Palestinian, Muslim, and Indigenous individuals and peoples, which demonstrates associational discrimination.

74. The facts presented here support Mr. Bishop's claim that he was fired due to discrimination for his association with Palestinian and Muslim individuals, as well as Indigenous anti-colonial activists.

75. His support for these communities was reflected in dozens of social media posts where he advocated for Indigenous rights and Palestinian human rights. Plaintiff's friendships with Palestinian and Muslim individuals, along with his long-standing advocacy for Indigenous causes, were well known to his supervisor, Safi.

76. Mr. Bishop's activism in support of Palestinian human rights and land dispossession issues related to Indigenous peoples was integral to his local activism and graduate research. His creation of the Sga:tędwatahí:ne Fellows Program at the Einhorn Center and his involvement in dialogue surrounding the rights of Indigenous communities further illustrate his commitment to these causes.

77. Defendants also engaged in unlawful discriminatory practices by discriminating against Plaintiff because of his anti-war political opinion.

78. In addition, Defendant Cornell did not protect Plaintiff from harassment by Defendant Foster, even after Plaintiff had filed a complaint against Foster.

79. The discrimination occurred in the course of Plaintiff's employment at Cornell University.

**Count II: Discrimination on the Basis of Ethnicity, Religion, and Association Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1)**

80. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

81. Plaintiff was qualified for his position with Defendant Cornell University.

82. Plaintiff was an exemplary employee and student.

83. Plaintiff was subjected to an adverse employment action.

84. Defendant terminated Plaintiff's employment on or about February 8, 2024.

85. The termination occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's association with a protected class.

86. Plaintiff's association with Palestinian, Muslim, and Indigenous individuals and peoples, constitutes an association with individuals of a protected class based on race, religion and/or national origin.

87. Defendant terminated Plaintiff's employment because of his advocacy for Palestinian rights, Muslim rights, and indigenous rights, which demonstrates associational discrimination.

88. The facts presented here support Mr. Bishop's claim that he was fired due to discrimination for his association with Palestinian and Muslim individuals, as well as Indigenous anti-colonial activists.

89. His support for these communities was reflected in dozens of social media posts where he advocated for Indigenous rights and Palestinian human rights. Plaintiff's friendships with

Palestinian and Muslim individuals, along with his long-standing advocacy for Indigenous causes, were well known to his supervisor, Safi.

90. Mr. Bishop's activism in support of Palestinian human rights and land dispossession issues related to Indigenous peoples was integral to his local activism and graduate research. His creation of the Sga:t ędwatahí:ne Fellows Program at the Einhorn Center and his involvement in dialogue surrounding the rights of Indigenous communities further illustrate his commitment to these causes.

91. Defendants also engaged in unlawful discriminatory practices by discriminating against Plaintiff because of his anti-war political opinion.

92. In addition, Defendant Cornell did not protect Plaintiff from harassment by Defendant Foster, even after Plaintiff had filed a complaint against Foster.

**Count III: Retaliation under Title VII**

93. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

94. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e-3(a) provides that it shall be unlawful employment practice for an employer: (1) to ...discriminate against any of his employees ...because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

95. Defendant Cornell engaged in unlawful employment practice prohibited by Title VII by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of his complaint against Defendant Foster and his opposition to the unlawful employment practices of Defendant. Defendant Cornell retaliated against Plaintiff first by suspending and then

terminating him, after he complained about Rachel Foster's harassment and attempts to have him unlawfully fired.

### Count IV: Discrimination Under the NYSBRL

96. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

97. Executive Law§ 296 provides that,

> 1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

98. Defendant Cornell University engaged in unlawful discriminatory practices by discriminating against Plaintiff because of his association with Palestinian, Muslim and indigenous rindividuals, which demonstrates associational discrimination.  Defendant also engaged in unlawful discriminatory practices by discriminating against Plaintiff because of his anti-war political opinion.

### Count V: Retaliation under the NYSHRL

99. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

100.      Executive Law § 296 provides that, "7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

101. Defendant Cornell University engaged in unlawful discriminatory practices by discriminating against Plaintiff because of his opposition to the unlawful employment practices of the Defendant.

**Count VI:  Violation of NY Labor Law Section 201-d**

102. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

103. Plaintiff engaged in protected political activities outside of working hours,  out of the employer's premises, and without use of the employer's equipment or other property.

104. Plaintiff's Facebook posts in support of Palestinian, Muslim, and Indigenous individuals and human rights, expressing anti-war sentiment and engaging in political advocacy, constitute protected political aand recreational activities under NY Labor Law Section 201-d.

105. Defendant discriminated against Plaintiff in terms, conditions, or privileges of employment.

106. Defendant terminated Plaintiff's employment Plaintiff for holding and expressing political views whose content Cornell had deemed unacceptable for Plaintiff to hold and express which constitutes discrimination in terms, conditions, or privileges of employment.

107. The discrimination was based on Plaintiff's protected activities.

108. Plaintiff's termination was due to Plaintiff's Facebook political posts establishing a direct link between the protected activity and the termination.


**Count VII: against Defendant Rachel Foster: Tortious Interference with an Advantageous Business Relationship**

109. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

110. Plaintiff had a business relationship with Cornell University.

111.  Plaintiff was employed by Cornell University and had an ongoing business relationship with the Cornell University.

112. As a member of the Alumni Advisory Council, Defendant Rachel Foster had knowledge of Plaintiff's business relationship with Cornell University.

113. Defendant Rachel Foster intentionally interfered with Plaintiff's business relationship with Cornell University.

114. Defendant reported Plaintiff's Facebook posts to Cornell University and sought Plaintiff's termination, which constitutes intentional interference with Plaintiff's business relationship.

115. Defendant used wrongful means or acted for a wrongful purpose in interfering with Plaintiff's business relationship.

116. By seeking Plaintiff's termination based on Plaintiff's exercise of free speech in expressing anti-war sentiment and advocating for Palestinian, Muslim, and Indigenous individuals and peoples, Defendant acted with a wrongful purpose because of her conflicting views.

117. Plaintiff suffered damages as a result of Defendant's interference. Plaintiff was terminated from his employment, and he suffered harm to his professional reputation. Plaintiff suffered emotional and psychological damages while attempting finish his doctorate degree with no guaranteed means of income.


**Count VIII against Defendant Rachel Foster: Tortious Interference With a Contractual Right**


118. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

119. Plaintiff was employed by Defendant Cornell University under a valid employment contract.

120. Defendant Rachel Foster had knowledge of Plaintiff's contract with Cornell University.

121. Defendant Rachel Foster intentionally and unjustifiably induced or otherwise caused Cornell University to breach the contract.

122. By reporting Plaintiff's Facebook posts and actively campaigning for Plaintiff's termination, Defendant intentionally attempted to induce Cornell University to breach Plaintiff's employment contract.

123. Defendant Cornell University breached the contract.

124. Plaintiff suffered damages as a result of the breach.

**Count IX against Defendant Rachel Foster: Discriminatory Harassment in Violation of NYSHRL, N.Y. Exec. L. § 296**

125. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

126. Plaintiff is associated with a protected class due to his association to Palestinian, Muslim, and Indigenous individuals and peoples. Plaintiff also holds an anti-war political opinion, which are protected characteristics under New York State Human Rights Law.

127. Defendant Rachel Foster engaged in harassing conduct against Plaintiff.

128. Defendant Rachel Foster reported Plaintiff to his employer, Defendant Cornell University, and sought Plaintiff's termination from employment.

129. The harassment was based on Plaintiff's association to Palestinians, Muslims, and Indigenous peoples, in addition to Plaintiff's anti-war political opinion.

130. Defendant's actions in reporting Plaintiff and campaigning for his termination were based on Plaintiff's association with Palestinians, Muslims, Indigenous individuals and peoples, and Plaintiff's anti-war political opinion.

18

131. As a result of Defendant Foster's actions, Plaintiff was terminated from his employment and suffered emotional distress and harm to his reputation.

132. There is a basis for holding Defendant Rachel Foster liable for the harassment. Defendant's actions violate the New York State Human Rights Law, which prohibits discriminatory practices, including harassment based on protected characteristics.

**Count X against Defendant Rachel Foster: Intentional Infliction of Emotional Distress**

133. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

134. Defendant engaged in extreme and outrageous conduct.

135. Defendant reported Plaintiff to Plaintiff's employer based on Plaintiff's Facebook posts and actively campaigned for the termination of Plaintiff's employment.

136. Defendant intended to cause Plaintiff severe emotional distress.

137. Defendant's actions in actively campaigning for Plaintiff's termination demonstrate an intent to cause Plaintiff severe emotional distress.

138. There is a causal connection between Defendant's conduct and Plaintiff's injury.

139. Defendant's actions directly targeted Plaintiff's employment, establishing a causal connection between Defendant's conduct and Plaintiff's emotional distress.

140. Plaintiff suffered severe emotional distress as a result of Defendant's actions due to the termination of employment and the harm to Plaintiff's professional reputation.

141. Defendant Foster's actions were motivated by Plaintiff's advocacy for Palestinian rights, Muslim rights, and Indigenous rights and association with those peoples. Additionally, Defendant's actions were motivated by Defendant's anti-war political opinion.

### Count XI against Defendant Cornell University: Promissory Estoppel

142. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

143. Plaintiff relied on Defendant Cornell University's academic freedom policy and social media policy that Plaintiff believed guaranteed Plaintiff's right to exercise free speech in the manner that he did.

144. Plaintiff relied on Safi's instruction to Plaintiff to refrain from contacting Defendant Foster, but yet later stated that one of the reasons for his termination was that he had not apologized to Defendant Foster.

145. Plaintiff relied on Safi's guarantee that if Plaintiff kept his Facebook posts private, there would be no issues, only for Plaintiff to be terminated later for a private Facebook post.

146. Plaintiff reasonably relied on these policies and assurances to his detriment.

### Count XII against Defendant Cornell University: Breach of Contract

147. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

148. A valid contract existed between Plaintiff and Defendant Cornell University.

149. Defendant's social media policy, free speech policy, and other internal policies constituted a contractual agreement between Plaintiff and Defendant.

150. Plaintiff fulfilled his job responsibilities and adhered to Defendant's policies, including the social media policy and free speech policy.

151. Defendant breached the contract.

152. Defendant terminated Plaintiff's employment due to Facebook posts, which was in direct violation of Defendant's own free speech policy.

153. Plaintiff suffered damages as a result of Defendant's breach.

154. As a result of the wrongful termination, Plaintiff has lost wages, benefits, and other employment opportunities.


### Request for Relief

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendant Cornell University engaged in unlawful employment practices prohibited by Title VI and VII of the Civil Rights Act of 1964;

B. Declaring that Defendant Cornell University engaged in unlawful employment practices prohibited by New York State Human Rights Law, N.Y Exec. L. § 296 et seq., ("NYSHRL");

C. Awarding Plaintiff compensatory damages for lost wages and benefits in an amount to be determined at trial;

D. Awarding Plaintiff compensatory damages for mental, emotional injury, distress, pain and suffering and injury to his reputation in an amount to be proven;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to any issues so triable.


Dated: Maspeth, New York

April 2, 2025

Respectfully submitted,

Signed/ Karl J. Ashanti
Karl J. Ashanti, Esq.
k.ashanti@musa-obregon.com

Signed / S.  Michael Musa-Obregon
 S. Michael Musa-Obregon, Esq.
michael@musa-obregon.com

Musa-Obregon Law, PC
55-21 69th Street, 2nd Floor
Maspeth, NY 11378
Tel: (718) 803-1000

Signed / Jonathan Wallace
Jonathan Wallace, Esq.
Jonathan.wallace80@gmail.com
PO Box 728
Amangasset, NY11930
917-359-6234